UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

| | | |
|---|---|---|
| KONATO WILLIAMS, #202610, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:05-cv-817 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| CAROL HOWES, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This is a civil rights action brought *pro se* by a state prisoner pursuant to 42 U.S.C. §1983. Plaintiff is currently an inmate at the Southern Michigan Correctional Facility located in Jackson, Michigan. (docket # 40). Plaintiff's complaint relates to a condition of his confinement during a 7-month period in 2005 when plaintiff was an inmate at the Lakeland Correctional Facility ("LCF") located in Coldwater, Michigan. Plaintiff alleges that defendants violated his Eighth Amendment rights by allowing him to be exposed to second-hand smoke ("ETS"). Plaintiff named LCF's Warden Carol Howes and Assistant Deputy Warden Robin Welke as defendants. Plaintiff's complaint requests an award of monetary damages against defendants in their individual capacities.

Now before me for the issuance of a report and recommendation is defendants' motion for summary judgment. (docket #21).[1] Plaintiff filed his response (docket #35, 38), and

_____

[1]On April 26, 2006, the court entered an order granting defendant Welke's motion to join in the motion for summary judgment filed by defendant Howes. (docket # 34).

the defendants' motion is ready for decision.[2]  For the reasons set forth herein, I recommend that defendants' motion for summary judgment be granted, and that judgment be entered in favor of defendants on all plaintiff's claims.

## Applicable Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006); *Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006).  The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Swiecicki v. Delgado*, 463 F.3d 489, 492 (6th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the party without the burden of proof (generally the defendant) seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or

---

[2]Only those portions of plaintiff's verified complaint satisfying the requirements of Rule 56(e) of the Federal Rules of Civil Procedure can be considered by the court in ruling on a summary judgment motion.  *See Weberg v. Franks*, 229 F.3d 514, 526 n. 13 (6th Cir. 2000).  "[I]t is well established that hearsay evidence cannot be considered by a trial court ruling on a motion for summary judgment."  *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000); *see Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006).

other materials "negating" the opponent's claim.  *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings.  FED. R. CIV. P. 56(e); *see Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006).  The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990).  "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'"  *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see Kessler v. Visteon Corp.*, 448 F.3d 326, 329 (6th Cir. 2006).  "A nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations.  Instead, the nonmoving party must present evidence to defeat a properly supported motion for summary judgment.  The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or to refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."  *Fogerty v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005).

**Facts**

The following facts are beyond genuine issue.  Plaintiff's was an inmate at LCF from March 30, 2005, until October 19, 2005.   During this 7-month period, plaintiff was provided with four different housing assignments.

A.      Unit B-4 Housing Assignment

Plaintiff arrived at LCF on March 30, 2005.  Prison intake staff assigned plaintiff to Housing Unit B-4.  (Plf. Aff. ¶¶ 3, 4, docket # 38 Ex. D; Howes Aff. ¶ 3, docket # 22; docket # 1, ¶¶ 9, 12,  15).  Plaintiff describes Unit B-4 as "barracks-type" housing.  (Plf. Aff. ¶ 6, docket # 38). Plaintiff states that he informed prison intake staff that he did not smoke, did not chew tobacco products, and that smoke aggravated his asthma.  On April 1, 2005, plaintiff signed a request for a tobacco free housing assignment on the basis of his personal preference and a claimed need of special accommodation on the basis of asthma.  (docket # 1, Ex. 1; Howes Aff. ¶ 4).  On April 5, 2006, Assistant Deputy Warden Welke approved plaintiff's housing request.  (docket # 1, Ex. 1). Plaintiff was housed in Unit B-4 for less than a month, from March 30, 2005, to April 28, 2005. (docket # 1, ¶ 17).  Plaintiff did not make any asthma-related healthcare requests during this period.

Plaintiff's health permitted him to participate in significant weight lifting exercises. On April 11, 2005, the then 31-year-old plaintiff told Diana L. Edwards, R.N., that he normally worked out with 600 pound weights every week.  On April 11, 2005, plaintiff reported to Nurse Edwards that he had suffered a leg muscle injury while lifting 800 pound weights.  Nurse Edwards instructed plaintiff to rest, use crutches, and to ice the affected area.  Nurse Edwards provided

plaintiff with Tylenol for pain relief.  (Edwards Aff. ¶¶ 4-5, docket # 22, Ex. A; *see also* 4/11/05

Nurse Protocol -- Muscle Strain/Sprain, docket # 22, Ex. C).

B.     Unit E-1 Housing Assignment

On April 28, 2005, plaintiff was transferred into LCF's Unit E-1 in an effort to

accommodate plaintiff's  request for housing within a tobacco-free unit. (Howes Aff. ¶ 5, docket #

22; Plf. Aff. ¶ 6(a), docket # 35; Plf. Aff. ¶ 6(a), docket # 38).  The rooms in Units E-1 and E-2 are

"dormitory-type" rather than "barracks-type." (Plf. Aff. ¶ 6, docket # 38).  The first day plaintiff was

assigned to Unit E-1 plaintiff wrote a letter to defendant Welke.  Plaintiff claimed that he had been

"Misled about Smoke/Tobacco Free Environment."  (docket # 1, Ex. 2).  Plaintiff complained that

the smoking ban that was already in place within Unit E-1 was insufficient.  He argued that Unit E-1

was not "totally smoke free" because even though smoking was prohibited within the housing unit

itself, prisoners assigned to the unit were still permitted to possess tobacco products.  (*Id.*).

On May 1, 2005, plaintiff signed grievance number LCF-2005-0418-03C.  (docket

# 1, ¶ 19 and Ex. 3B; Plf. Aff. ¶ 7, docket #'s 35, 38).  The body of plaintiff's grievance is set forth

verbatim below:

> My life is being endangered and LCF is complicit in the matter in a way that allows the
> problem to continue.  I have had asthma my whole life and it has been proven scientifically
> that tobacco irritates the lungs of people with asthma (makes it worse).  I arrived at LCF on
> 3-30-05.  On 4-1-05 I signed the MDOC Tobacco Free <u>Housing</u> Form CAH-100 to be placed
> in a unit where I would not be exposed to smoking material.  On 4-28-05 I was moved to E-
> 1-107 where I was misled to believe and accept that this was to accommodate <u>Tobacco Free
> Housing</u>.  Prisoners in E-1 are allowed to purchase and possess tobacco products.  This was
> brought to the attention of the ADW of housing.  I signed an official MDOC form for
> tobacco free housing.  E-1 cannot and does not <u>in fact</u> provide me with that because prisoners
> are allowed to possess smoking material.  To keep me <u>housed</u> where smoking material is
> allowed is violating the agreement to which I signed to be in tobacco free housing.  It
> constantly puts my life in danger by exposing me to the presence of smoke after I have made
> every attempt to be placed in a unit where this possibility will not exist.  To designate an area

in a dormitory setting as tobacco free while the remainder of the dormitory is allowed to possess and purchase tobacco is to nullify the effectiveness of the intended purpose of the court order to provide me with smoke/tobacco free housing.

Because of the serious nature of this grievance and my medical condition I am officially requesting that this grievance be responded to within 2 business days.  I made an attempt to resolve this grievance via a kite to the ADW of housing with no response.

NOTE: I have several prisoners in E-1 as witnesses who're willing to admit that they smoke in the Unit, evidence that I am being exposed to smoke.

(docket # 1, Ex. 3B).

On or about May 10, 2005, LCF healthcare workers received the first of the two asthma-related healthcare requests that plaintiff filed during his incarceration at LCF.  Plaintiff indicated that he was being exposed to smoke, that the smoke aggravated his asthma, and that plaintiff found it necessary to use his inhaler almost every time he left Unit E-1's bathroom.  A healthcare appointment was scheduled for May 12, 2005.  Plaintiff was instructed to report to Unit E-1's assistant resident unit manager any incident where plaintiff encountered another prisoner smoking in an area where smoking was prohibited.  (docket # 1, ¶ 20 and Exs. 4, 28).

On May 12, 2005, Shirleyann M. Zobian, R.N., completed a special accommodation notice.  The notice did not identify any medical condition, but did offer Zobian's conclusion that the following accommodation was appropriate: "Other (non-tobacco unit) from 5/12/2005."  (docket # 1, Ex. 6; docket # 22, Ex. 3, ¶ 6).  This was the first documentation at LCF that plaintiff needed any accommodation relating to tobacco smoke.  (Howes Aff. ¶¶ 6, 7).  Plaintiff did not submit medical records in support of his claims against the defendants.  Throughout his complaint plaintiff simply states that he has asthma.

On May 16, 2005, plaintiff wrote a letter to Warden Howes requesting that she arrange his transfer to a prison facility located in the Detroit area to be closer to his ailing grandmother and because plaintiff believed that permitting any tobacco products within LCF's Unit E-1 fell short of providing him with "tobacco free" housing:

> On 5-12-05 I was seen by medical because of my asthma getting worse because of me constantly being exposed to smoke.  I was given a special accommodation for a non-tobacco Unit.  E-1 has prisoners in it who are allowed to possess and purchase tobacco so I am not in a non-tobacco unit as stated on my special accommodation.  There are no non-tobacco units available at this time at LCF.  A designated area in a unit where tobacco is allowed is not a unit as my special accommodation specifies.

> On 5-13-05 I spoke with you regarding my ailing grandmother and a transfer to a facility in Detroit.  You told me that you would pass my kite to the transfer coordinator.  I've already explained my situation about my grandmother to you.  Both RRF [Ryan Correctional Facility] and NRF [Mound Correctional Facility] have tobacco free Units and you've already told me that you'll send me.  To resolve this matter and the issue with my grandmother please send me there so I can get in a non-tobacco unit and see my ailing grandmother as soon as possible.

(docket # 1, Ex. 7).  On May 21, 2005, plaintiff wrote a similar letter to defendant Welke regarding plaintiff's desire for a transfer to the Ryan Correctional Facility or Mound Correctional Facility. (docket # 1, Ex. 8).  Plaintiff's letter to Welke expressed dissatisfaction with Welke's efforts to have plaintiff moved to LCF's "8-man cubicles" because plaintiff did not believe that such housing would constitute a non-tobacco unit.  (*Id.*).

On May 27, 2005, MDOC's Grievance Coordinator Steven A. Winchester granted an extension until June 8, 2005 for completion of the Step I investigation of grievance number LCF-2005-0418-03C.  (docket # 1, Ex. 10).

-7-

In late May or early June 2005, plaintiff learned that prison officials at LCF were planning to convert Unit E-2 into a tobacco-free unit.  MDOC rules prohibit prisoners housed within tobacco-free units from smoking anywhere within the unit.  Those prisoners are also prohibited from purchasing or using tobacco products.  (Howes Aff. ¶ 7).  On June 5, 2005, plaintiff wrote a two-page letter addressed to Warden Howes  (docket # 1, Ex. 11A) reiterating plaintiff's request to be transferred to the Ryan Correctional Facility or Mound Correctional Facility because he "really need[ed] to see his grandmother before she die[d]."  Plaintiff expressed his skepticism regarding the future effectiveness of LCF's conversion of Unit E-2 into a tobacco-free unit.  Plaintiff stated that he had conducted his own "survey" of LCF prisoners and believed that prison officials would discover that few prisoners desired tobacco-free housing, and that many prisoners would take whatever steps they found necessary to avoid being moved from their current housing assignments.  Plaintiff's June 5, 2005, letter to defendant Howes emphasized that plaintiff hadn't "truly pressed" the issue about his special accommodation:

> Be advised that on 5/31/05 I provided a copy of my Special Accommodation for non-tobacco unit to ARUS Desmond.  He informed me that plans are being made to make E-2 a non-tobacco unit.  On the weekend of 6/3/05 I did a survey of some of the prisoners in the 8-man cubicles.  Many of them will sign off the tobacco-free housing when they're required to move to another unit e.g., dormitory (pole-barn).  There are also prisoners in E-1 non-smoking areas who are going to sign off once they are required to move.  I gathered same for F-1 & 2.
>
> As of today, 6/5/05, no memo is posted giving prisoners a chance to consider if they want to move to a non-tobacco unit or not, thus giving this Administration a read on the number of prisoners who actually want a non-tobacco unit.  Once this total is accumulated then your staff will have an accurate read on if it will be prudent to convert a 140-bunk unit into non-tobacco.  That process will take approximately 2-to-6 weeks at which time you will discover that nearly none of the prisoners who are presently housed in the 8-man and only

approximately 45-to-50% of the prisoners in the other units already settled are willing to move.

My point is that it is unlikely that E-2 will be filled with non-smokers.  There will be at least 60% who will be smokers and the process of making the unit 90% non-smokers will take approximately 60-to-90 days if enough prisoners sign up to even designate E-2 as a non-tobacco unit.

Meanwhile, as of 5/12/05, I have a Special Accommodation for a non-tobacco unit which is not being honored as of 6/5/05, and cannot be honored at LCF in the near future.  Ma'am, I have not <u>truly</u> pressed the issue about the Special Accommodation, despite the fact that I can, and my asthma has gotten worse because of my constant exposure to smoke.  In truth, my health is in danger, and it is unreasonable to keep me housed under such conditions, especially after Health Services has clearly indicated that I need to be in a non-tobacco unit nearly one month ago.

I have suffered greatly because I really need to see my grandmother before she dies, and the only way that can happen is if I am at a facility in Detroit (RRF or NRF) and because you told me that you'll send me I suffer patiently.  Ma'am, the present course planned by your staff, while honorable, will not be effective for a while because of the set-up of this facility; most prisoners do not have asthma and would prefer comfort; many do not wish to move especially to E-2.

I have put my health and well-being on hold in the hopes that you would <u>seriously</u> look at all that I have presented to you and send me to RRF or NRF.  Both of these facilities have well-established non-tobacco units.  Please send me to one of those facilities so that I can see my grandmother.  Please note that I have remained patient under the most stressful and life-threatening conditions because I need to see my grandmother before she dies.  I pray that my condition is not being ignored by you.  I really need to see my grandmother before she dies and my family cannot bring her to a facility outside of Detroit because she is not strong enough for any long-distance travel.

Lastly, I urge you to post a memo requiring prisoners who desire to be placed in a non-tobacco unit to sign up through their ARUS.  I assure you that you will not receive 140 persons.  If a non-tobacco unit is designated without this process, it will lead to other problems, i.e., prisoners still getting tobacco and smoking in the unit, which will create a more hostile environment.  To force-move a large number of prisoner[s] would also create a hostile/dangerous environment.

(docket # 1, Exs. 11A, B).

During the period of approximately 5 weeks (April 28, 2005, to June 6, 2005) that plaintiff was housed in Unit E-1, 6 Unit E-1 prisoners were caught smoking in violation of prison rules.   These prisoners received misconduct citations and were successfully prosecuted.  (docket # 22, Ex. B, Attachment B).

C.      Unit E-2 and C-3 Housing Assignments

LCF prisoners were notified in June of 2005 that Unit E-2 was being designated as a tobacco free unit.  Prisoners were instructed to contact Resident Unit Manager Januszka if they wanted to reside in this tobacco free unit.  (docket # 1, Ex. 19).   On June 7, 2005, plaintiff was reassigned to Housing Unit E-2.  Defendant Welke had also offered plaintiff  a housing placement in Unit B's tobacco free area, but plaintiff had declined Welke's offer because plaintiff would not receive a bottom bunk assignment.  (Howes Aff. ¶ 7, docket # 22; docket # 1, ¶ 43; *see also* Plaintiff's History of Cell Usage, docket # 22, Ex. B, Attachment A).

The day plaintiff transferred into Unit E-2 he wrote a letter addressed to Warden Howes regarding a conversation plaintiff had with the Warden Howes earlier that day about his desire for a transfer to the Ryan Correctional Facility or Mound Correctional Facility.  The same letter described plaintiff's conversation with RUM Januszka regarding Januszka's progress in converting Unit E-2.  The body of plaintiff's letter is set forth verbatim below:

> I spoke with you today 6-7-05 regarding my being transferred to RRF or NRF to see my grandmother before she dies.  You told me that you would sit down to talk to (Lorrie) Miller tomorrow about your kites.  Please keep my kites to you in mind and try to get me to a facility in Detroit as soon as possible.

-10-

Second, I also spoke with you about my being moved to E-2 for a Non-Tobacco Unit. I spoke with RUM JANUSKZA TODAY ABOUT THE UNIT BEING Non Tobacco. He stated he only had 63 names and while the plan was to have E-2 as a Non Tobacco unit by June 29th, it won't happen, were his words to me on 6-7-05.

This means that my special accommodation for Non Tobacco Unit still is not being honored and cannot be honored at LCF at this time. Both RRF and NRF have tobacco free units presently operational. RUM Januskza is the second shift staff at LCF who has told me either by word or inference that LCF cannot accommodate my tobacco free special accommodation, RUM Januszka by telling me that he only has 63 names of people who have signed up for Tobacco Free Housing in a unit which houses 140 people . . Please send me to RRF or NRF to honor my special accommodation and allow me to see my grandmother.

(docket # 1, Ex. 12).

On July 4, 2005, prisoner Andra Young signed an affidavit on plaintiff's behalf stating that Young had been an inmate housed within LCF's Unit E-2. Prisoner Young did not identify any prisoner who had smoked within Unit E-2 in violation of applicable rules. Young offered a statement that, "Since my arrival at this facility, I have continuously observed many prisoners openly smoking throughout the housing unit and also within the 20-foot prohibited area outside of the housing unit." Young's affidavit did not provide specific facts concerning any incident that occurred on an after June 7, 2005, when plaintiff was housed in Unit E-2. (Young Aff., ¶¶ 1-5, docket # 1, Ex. 20).

On or about July 7, 2005, plaintiff filed a complaint with the Michigan Civil Service Commission. Plaintiff requested that disciplinary action be taken against the defendants and other State of Michigan employees. (docket # 1, Ex. 22A; *see also* docket # 1, ¶ 38). Plaintiff appended to his civil service commission complaint affidavits from prisoners Dushawn Johnson and Camel Johnson. Their July 7, 2005 affidavits stated that they were housed in the Unit E-2 and that the Unit

had been designated as tobacco free, effective July 1, 2005.   Dushawn and Camel Johnson stated that within the 6-day period after the Unit's conversion they were still able to purchase tobacco products at the prison's store.  (docket # 1, Exs. 22 J, ¶ 4 and 22K, ¶ 4; *see also* Ex. 26B, ¶ K). Camel Johnson made a vague assertion that there were unidentified prisoners at unspecified times "who regularly and openly smok[ed] in housing unit E-2."  (docket # 1, Ex. 22K, ¶ 4).  Plaintiff also attached to his civil service commission complaint a July 4, 2005, affidavit from prisoner Charles Smith.  Smith's affidavit stated that he was an inmate in Unit E-1, and that during the period plaintiff had been housed in E-1, Smith had observed unidentified prisoners smoking.  (docket # 1, Ex. 22L). Plaintiff asked the Michigan Civil Service Commission impose disciplinary sanctions against defendants and others. He also asked for an order for his immediate transfer to the Ryan Correctional Facility or the Mound Correctional Facility.  (docket # 1, ¶ 22(a) and Ex. 22H).

On July 12, 2005, RUM Januszka issued the Step I response to Grievance No. 2005-05-0418-03C.  The Step I response indicated that plaintiff's grievance had been partially resolved because plaintiff had been moved from Unit E-1 to E-2.  RUM Januszka was in the process of converting Unit E-2 into a completely tobacco free housing unit:

> I am moving prisoners out of E-2 who have signed the tobacco free housing form and when they are found to have tobacco or tobacco paraphernalia in their possession.  I also move out prisoners who violate the rules for smoking in E-2 or possess tobacco in the bathrooms.  As I get kites and tobacco free housing forms from prisoners in other housing units I am moving them into E-2.  This is a slow process as I only receive three to four kites a week requesting tobacco free housing and some of the prisoners are manipulating the process by signing up knowing full well they don't intend to quit or find out they don't have the willpower to quit.

(docket # 1, Ex. 23D).  The Step I response traced plaintiff's history of LCF housing assignments. The response noted that plaintiff had been moved to the tobacco free area of Unit E-1, but that other prisoners who had not signed the tobacco free form remained in the unit.  Because plaintiff's grievance indicated that he had several prisoners in Unit E-1 who were witnesses to other prisoners smoking in the unit in violation of the rules, plaintiff was asked to identify these witnesses.  Plaintiff responded that he was not willing to supply Januszka with their names.  Plaintiff indicated that prison officials would find out who some of the witnesses were "in further affidavits relating to his cause." (docket #1, Ex. 23D).

Plaintiff pursued a Step II grievance appeal, and on July 29, 2005, Warden Howes provided her Step II response, which states in pertinent part as follows:

> In RUM Januszka's response to the same grievance, it is noted that Mr. Williams was uncooperative with the grievance investigator when he was asked to provide a list of the names of the prisoners who were in violation of the non-smoking aspect of the unit.  This lack of cooperation on Mr. Williams'[s] part, impeded the Step I respondent and his ability to seek a true understanding of the grievant's concern.
>
> LCF has designated E-2 Unit as a tobacco-free environment and Mr. Williams has been moved into that unit.  RUM Januszka is working towards a tobacco free unit but is limited at this time by the number of requests that are received from prisoners.  The information received from the Step II statements and attachments will be shared with RUM Janus[z]ka to further him with the transition of E-2 into a tobacco free unit.
>
> Grievance is denied at Step II.

(docket #1, Ex. 23C).  The Step I and Step II decisions were upheld at Step III.  (docket # 1, Ex. 23D-1).

-13-

On August 5, 2005, plaintiff drafted the second asthma-related healthcare request he made at LCF which stated:   "My asthma inhaler now is barely working to control my asthma.  My asthma has gotten worse and I need more treatment.  I've had a[n] asthma attack today."  (docket # 1, Ex. 29).  The nurse's response to this health care request indicates that plaintiff was scheduled for sick call.  (*Id.*).

On August 16, 2005, Warden Howes filed her  response to plaintiff's Michigan Civil Service Commission complaint:

> I have thoroughly read your complaint and have noted the issues you have raised.  The purpose of this correspondence is to respond to your concerns.
>
> You arrived at the Lakeland Correctional Facility on 3/30/05 and requested tobacco-free housing shortly thereafter.  Your request for tobacco free housing was signed on 4/5/05, and you were placed in tobacco free housing on 4/28/05.
>
> On 6/7/05, you were placed in the tobacco-free unit at your request, which was started at that time.  As you know, it is our goal that only non-smokers reside in this unit.  Furthermore, this unit is staffed with people who do not use tobacco products.
>
> I have discussed the issues with staff and am advised that any prisoner caught violating the housing rules regarding smoking is dealt with by removing them from the tobacco-free housing unit.  Although there are a few tobacco users in the E-2 housing unit, it is against the rules to smoke inside the housing unit or within 20 feet of the housing unit.  As another measure, the Prisoner Store staff will no longer permit prisoners in the tobacco-free unit to purchase or possess any tobacco related item.
>
> I realize that you have been frustrated with your situation here, however, I want to assure you that we are taking every possible precaution in enforcing the no smoking rules and assuring that prisoners here have tobacco-free housing.
>
> Since your placement in tobacco-free housing, you have continued to request, on several occasions, a transfer to the Detroit area.  Unfortunately, I have been unable to accommodate your request.

-14-

(docket # 1, Ex. 33).

On August 22, 2005, LCF Unit E-2 prisoners James Sturdivant, Andra Young, and Mark Reedy-Bey signed affidavits on plaintiff's behalf. Sturdivant's and Young's affidavits stated that they had observed unidentified prisoners smoking cigarettes in Unit E-2 and had "daily and nightly witnessed cigarette tobacco smoke hovering in the atmosphere throughout [] Housing Unit [E-2]." (docket # 1, Ex. 30, ¶ 5 and Ex. 31, ¶ 5). Prisoner Reedy-Bey stated that he had observed unidentified prisoners smoking cigarettes and had "daily and nightly smelled cigarette smoke hovering in the atmosphere of LCF housing Unit E-2." (docket # 1, Ex. 32, ¶ 6).

On August 26, 2005, plaintiff signed a 6-page letter addressed to Warden Howes which acknowledged plaintiff's receipt of the warden's response to plaintiff's Michigan Civil Service Commission complaint. Plaintiff argued that prison staff had misadvised the Warden Howes about prisoners being removed from the tobacco-free unit when they were found in violation of the rules. Plaintiff stated that on June 30, 2005, a day before the effective date of Unit E-2's conversion to tobacco free status, Prisoner Timothy Gaines had received a minor misconduct citation for violating rules prohibiting smoking. Prisoner Gaines had been convicted of the misconduct,[3] but had not been removed from Unit E-2 based on his misconduct predating Unit E-2's conversion. Plaintiff's letter to Warden Howes admitted that as of August 5, 2005, approximately one month after Unit E-2 had been designated as tobacco free, Unit E-2 prisoners were not able to purchase

---

[3]Plaintiff attached an affidavit from prisoner Gaines to his complaint (docket # 1, Ex. 27) in which Gaines asserted that he should not have been found guilty of the misconduct and arguing that housing staff had "irresponsibly failed to relocate [Gaines] from LCF, away from people who do not smoke tobacco products . . . ." (*Id.* ¶¶ 12, 13).

tobacco products.[4]   Plaintiff again demanded his immediate transfer to a "fully-functional, Zero-tolerance, Tobacco-Smoke Free Housing Unit."  (docket # 1, Ex. 34; *see also* docket # 1 ¶¶ 40-42 and Exs. 27, 28).

Plaintiff's affidavit states, "After getting into several verbal altercations with other incarcerated persons because of their smoking in the unit in my presence, [plaintiff] submitted another grievance about LCF administrative staff housing smokers who did not ask to be in a tobacco free unit around me, and creating a dangerously hostile environment for [plaintiff] to reside in." (Plf. Aff. ¶ 10, docket #'s 35, 38).  On September 27, 2005, plaintiff filed a grievance complaining that his placement in LCF's Unit E-2 placed him at risk of physical confrontations with inmates who were smoking in violation of the prison's rules:

> (3)  On several occasions since 7-1-05, while being confined in the so-called LCF Tobacco-Free Housing Unit E-2, I have been forced to confront several incarcerated persons about smoking tobacco products while I am in the lavatory, in the shower and while I am sleeping. This has resulted in dangerous hostility between me and several of those people.  Because I am an asthma sufferer, I am forced to continue such confrontations.  Those confrontations will inevitably result in physical altercations as incarcerated persons will tire of me confronting them about tobacco products in my presence or near me.

> (4) The condition of confinement described in above paragraph 3, therefore [] threatens my physical health (by subjecting me to the potential of being physically injured), frustrates my rehabilitation (by causing me to be in circumstances which can cause me to incur a major misconduct report for fighting or assault and battery), and increases the probability of my future confinement (by causing me to be in circumstances which will result in my being criminally prosecuted if I incur a serious assault and battery related to the abovesaid confrontations).

---

[4]Paragraph 40 of plaintiff's verified complaint identifies July 27, 2005, as the last day Unit E-2 prisoners had been able to purchase tobacco products.

-16-

(5) Warden Howes, along with her abovesaid subordinates, creates the conditions described above in paragraphs 3 and 4 by <u>continuing</u> to confine people in LCF E-2 who are cigarette tobacco users, by <u>not removing</u> all people from LCF E-2 who are cigarette tobacco smokers, and by not transferring non-smokers from LCF to a MDOC penal facility whereat exists a fully Tobacco-Free Housing Unit.

(docket # 38, Ex. A-1).  On October 11, 2005, plaintiff was reassigned to LCF's Housing Unit C-3. (docket # 22, Ex. B).  Plaintiff has made no allegations in this case and has submitted no evidence concerning the 8-day period he was housed in Unit C-3.  The Step I response to plaintiff's grievance expressing concern for his personal safety stated, "Your concerns have been reviewed.  A transfer is being initiated to accommodate your needs."  (docket # 35, Ex. A-1).  On October 13, 2005, Deputy Warden Bonita Hoffner approved plaintiff's transfer.  (docket # 35, Exs. B, C).  On October 19, 2005, plaintiff was transferred from LCF to the Riverside Correctional Facility ("RCF"), located in Ionia, Michigan.  (Plf. Aff. ¶ 11, docket # 35).

During the 4 months plaintiff was housed in LCF's Unit E-2 (June 7, 2005, to October 11, 2005), LCF's guards issued misconduct citations against and successfully prosecuted 11 Unit E-2 prisoners for violations of the rules prohibiting possession or use of tobacco.  (docket # 22, Ex. B, Attachment B).

During the entire 7 months that plaintiff was an LCF inmate, the prison, (including all housing units, bathrooms and common areas) was in compliance with applicable indoor air quality standards.  (Howes Aff. ¶ 9; docket # 22, Ex. B, Attachment C).  During this period the MDOC rules prohibited smoking within all prisoner housing units and within 20 feet of building entrances.  (Policy Directive 01.03.140, ¶ B, effective November 15, 2004, docket # 1, Ex. 26A).

-17-

Plaintiff did not submit any medical evidence that he suffered physical injury as a result of exposure to second-hand smoke at LCF.  Plaintiff states that his exposure to second-hand smoke in housing Units B-4, E-1 and E-2 caused him to "abnormally cough[]" and "use his medial inhaler an unusual amount of times."  (docket # 1, ¶ 45).

On December 28, 2005, plaintiff filed this lawsuit against defendants in their individual capacities seeking an award of monetary damages.

## Discussion

### I.      Eighth Amendment Claims of Deliberate Indifference to Serious Medical Needs

The Supreme Court has recognized that, "[T]he Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort." *Rhoades v. Chapman*, 452 U.S. 337, 349 (1981); *accord Bruggeman v. Paxton*, 15 F. App'x 202, 205 (6th Cir. 2001)("The Constitution does not mandate comfortable prisons" and a prisoner's claim that he was denied transfer to a prison or unit where he would have been more comfortable fails to state a claim.).  Plaintiff's complaint alleges as follows:

> Plaintiff's sole CIVIL RIGHTS VIOLATION CLAIM against each of the two Defendants is that, while acting under color of State of Michigan Law from 3-30-05 to at least 8-14-05 in their MDOC employment at LCF, Ms[.] Howes and Ms[.] Welke together subjected plaintiff to CRUEL AND UNUSUAL PUNISHMENT in violation of the EIGHTH AMENDMENT to the UNITED STATES CONSTITUTION, where those Defendants together exercised deliberate indifference to Plaintiff's serious medical needs by having wantonly as well as injuriously caused Plaintiff to suffer needless physical pain as Plaintiff's asthmatic condition was aggravated daily due to second-hand cigarette smoke daily and nightly hovering in the LCF Housing Units that those two defendants irresponsibly

-18-

constrained Plaintiff to reside in from 3-30-05 to at least 8-14-05 or for at least 135 consecutive days.

(Complaint, ¶ 7).[5]  Plaintiff alleges that defendants were deliberately indifferent to his serious medical needs in violation of plaintiff's Eighth Amendment rights under the Cruel and Unusual Punishments Clause.  In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs, manifested by prison staff's intentional interference with treatment or intentional denial or delay of access to medical care, amounts to the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  *Estelle*, 429 U.S. at 104-05.  In judging the sufficiency of "deliberate indifference" claims, the court must view the surrounding circumstances, including the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention.  *Westlake v. Lucas*, 537 F.2d 857, 860 n.4 (6th Cir. 1976); *see Byrd v. Wilson*, 701 F.2d 592 (6th Cir. 1983).

In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court clarified the deliberate indifference standard.  Under *Wilson*, a prisoner claiming cruel and unusual punishment must establish both that the deprivation was sufficiently serious to rise to constitutional levels (an

---

[5]It is pellucid that plaintiff desired a transfer from LCF, and that he would have preferred incarceration in the Detroit area at the Ryan Correctional Facility or Mound Correctional Facility. Plaintiff did not enjoy any constitutional right to be housed in the prison of his choice.  Plaintiff's assignment to LCF and the defendants' failure to transfer plaintiff to one of the two desired prisons in the Detroit area are "not subject to audit under the Due Process Clause."  *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see e.g.*, *Myles v. Crowley*, No. 98-1908, 1999 WL 1313, at *1 (6th Cir. Nov. 4, 1999)("Myles's claim that the denial of his transfer request constituted a violation of his right to due process is frivolous because there is no right under federal law giving a prisoner any choice concerning the facility where he will be incarcerated.")(citing *Meachum*).

objective component) and that the state official acted with a sufficiently culpable state of mind (a subjective component).  501 U.S. at 298.  No reasonable trier of fact could find in plaintiff's favor on either component of his claims against the defendants.

        The objective component of the Eighth Amendment standard requires that a plaintiff be suffering from a serious medical condition.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious."  *Hudson v. McMillian*, 503 U.S. 1,  9 (1992).  "[D]elay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute a constitutional violation."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2005).  "[A] medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.*  A non-obvious need for medical care can satisfy the "serious" medical need requirement, but "the inmate must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment."  *Johnson v. Karnes*, 389 F.3d 868, 874 (6th Cir. 2005); *see Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).  Plaintiff has not submitted any medical records.  He did obtain a special accommodation and stated in a verified complaint that he has asthma.  However, the mere presence of a serious medical condition is insufficient to establish the objective component.  The plaintiff must make "an 'objective' showing that the deprivation was 'sufficiently serious' or that the result of the defendant's denial was

-20-

sufficiently serious." *Hudson*, 508 U.S. at 8; *see Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

Plaintiff falls far short of satisfying the objective component.  Plaintiff has not alleged or submitted evidence that he received constitutionally deficient medical care for any medical condition during his confinement at LCF.  The record shows that plaintiff submitted two asthma-related healthcare requests: the first on May 10, 2005 (docket # 1, Ex. 4), and the second 3 months later on August 5, 2005 (docket # 1, Ex. 29).  In both instances, plaintiff received medical attention a short time after he submitted his healthcare request.  (*Id.*).  Plaintiff did not present any evidence indicating that he required hospitalization or other emergency medical attention.  There is no medical evidence that plaintiff's asthma was particularly severe.  There is no evidence that either defendant denied or delayed plaintiff's access to medical care.  The defendants are supervisors, not first-line healthcare providers or prison guards.   Liability of supervisory officers under 42 U.S.C. § 1983 cannot be based upon a *respondeat superior* theory.  *See Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006); *Turner v. City of Taylor*, 412 F.3d 629, 643 (6th Cir. 2005).[6] Plaintiff has not presented evidence that either defendant caused an objectively serious deprivation.  *See Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006); *Jarriett v. Wilson*, 162 F. App'x 394, 402-03 (6th Cir. 2005).  I find that no

---

[6]Plaintiff's contention that the defendants' actions constituted a violation of a "non-smoking agreement" fails to state any claim of constitutional dimension.  *See Williams v. Love*, 1:06-cv-380, 2006 WL 1722229, at * 1 (W.D. Mich. June 21, 2006).

reasonable trier of fact could find in plaintiff's favor on the objective component of his Eighth Amendment claims against defendants.

The second prong under Estelle requires a showing of "deliberate indifference" to plaintiff's serious medical need.  The Supreme Court held in *Farmer v. Brennan*, 511 U.S. 825 (1994), that deliberate indifference is tantamount to a finding of criminal recklessness.   A prison official cannot be found liable for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety." 511 U.S. at 837.  The Sixth Circuit's decision in *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005), summarized the subjective component's requirements:

> The subjective component, by contrast, requires a showing that the prison official possessed a sufficiently culpable state of mind in denying medical care.  Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.  The prison official's state of mind must evince deliberateness tantamount to intent to punish. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference. Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Miller*, 408 F.3d at 813 (citations and quotations omitted).   Plaintiff obtained a special accommodation notice from a nurse on May 12, 2005, and made 2 asthma-related healthcare requests over a 7-month period.  There is no evidence that the "defendants deliberately failed to respond to the repeated recommendations by medical personnel that [plaintiff] be removed to a smoke free environment in order to avoid further detriment to his health." *Reilly v. Grayson*, 310 F.3d 519, 521 (6th Cir. 2002).  MDOC rules prohibited smoking in all the LCF housing units.  Plaintiff was provided with 4 different housing assignments during his 7 months of incarceration at LCF in

-22-

persistent efforts to minimize plaintiff's potential exposure to ETS from prisoners who smoked in violation of MDOC rules. The prisoners who smoked in violation of the rules were prosecuted and punished. Defendants established Unit E-2 as a tobacco-free unit and assigned plaintiff to it. I find that no reasonable trier of fact could find in plaintiff's favor on the subjective component of his Eighth Amendment claims.

## II.   Eighth Amendment Claims of "Future Injury" Based on ETS Exposure

Plaintiff' *pro se* complaint is not a model of clarity. The complaint's reference to the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993) and the subsequent citations to *Helling* appearing in plaintiff's briefs (docket # 35 at 5, docket # 38 at 5) suggest that plaintiff is attempting to assert Eighth Amendment claims against defendants based on possible damage to his future health arising from the ETS exposure that occurred at LCF. *Helling v. McKinney* is the seminal case in this area. In *Helling v. McKinney*, a Nevada prisoner alleged his Eighth Amendment rights under the Cruel and Unusual Punishments Clause had been violated by his double bunk assignment to a cell with another inmate who smoked five packs of cigarettes per day. The Supreme Court held that the prisoner had successfully alleged an Eighth Amendment violation by claiming that the defendants had, with deliberate indifference, "exposed him to levels of ETS that pose[d] and unreasonable risk of serious damage to his future health." 509 U.S. at 35. The Supreme Court emphasized that on remand the prisoner would be required to prove both the subjective and objective elements necessary to prove an Eighth Amendment violation, and that a failure of evidentiary proof as to either element would entitle the defendants to judgment in their favor. *Id.* The Court reiterated

-23-

that "while the Eighth Amendment applies to conditions of confinement that are not formally imposed as a sentence for a crime, such claims require proof of a subjective component, and that where the claim alleges inhumane conditions of confinement or failure to attend to a prisoner's medical needs, the standard for that state of mind is the 'deliberate indifference' standard of *Estelle v. Gamble*, 429 U.S. 97 (1976)." *Helling*, 509 U.S. at 29-30.   The Court's discussion of the subjective component in *Helling v. McKinney* concluded with direction to the lower court that on remand "deliberate indifference" was to be determined in light of the current conduct and attitudes of prison authorities, and that adoption of smoking policies would "bear heavily on the inquiry." 509 U.S at 36.   The lower court's inquiry was also take into consideration the realities of prison administration.   *Id.* at 36-37.   Shortly after *Helling*, the Supreme Court's *Farmer v. Brennan* decision made it clear that, "[A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  511 U.S. at 837.

   *Helling v. McKinney* carefully outlined the objective component of a prisoner's Eighth Amendment future injury claim based on prison ETS exposure.  The plaintiff must present proof of exposure to unreasonably high levels of ETS.[7]  509 U.S. at 35.  "More than mere scientific

---

[7]"Plainly relevant to this determination" was the fact that plaintiff had been moved to a different prison and was "no longer the cellmate of a five-pack-a-day smoker."  509 U.S. at 35-35. The Supreme Court also observed that the prison had adopted a formal smoking policy restricting

and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will be caused by exposure to ETS" is necessary to establish the objective component. 509 U.S. at 36. "It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.* Plaintiff has not presented evidence on which a reasonable trier of fact could find in his favor on either the subjective or objective components of this type of Eighth Amendment claim against defendants. *Helling v. McKinney* did not mandate smoke free prisons. *See Scott v. District of Columbia*, 139 F.3d 940, 942 (D.C. Cir. 1998); *Mansoori v. Lappin*, No. 04-3241-JAR, 2007 WL 401290, at * 9 (D. Kan. Feb. 1, 2007)("[U]nder constitutional law, plaintiff is not entitled to a smoke free correctional facility.").

Plaintiff was assigned to 4 different housing units during his relatively brief period of incarceration at LCF, a tobacco-free unit was established and plaintiff was assigned to it. Plaintiff presented no evidence that defendants had knowledge that plaintiff's asthma was particularly severe. Plaintiff did present evidence that he had significant ulterior motives for requesting that the defendants transfer him to prisons in the Detroit area. There is no evidence before the court supporting plaintiff's expressed belief that either of the two Detroit-area prisons posed a lower risk of ETS exposure. The defendants directed their subordinates to enforce the applicable non-smoking

---

smoking to certain areas and where wardens could, contingent on space availability, designate non-smoking areas in dormitory sections. The Court noted that the changed policies could make it impossible for the plaintiff to prove that he would be exposed to an unreasonable risk with respect to his future health or entitlement to an injunction. *Id.* at 36.

policies. Enforcement efforts were significantly hampered by the refusal of plaintiff and other prisoners to identify inmates who violated the rules, but the record shows that some prisoners were successfully prosecuted. It is well established that imperfect enforcement of a non-smoking policies does not rise to the level of deliberate indifference. *Talal v. White*, 403 F.3d 423, 427 (6th Cir. 2004); *Wilson v. Hofbauer*, 113 F. App'x 651, 652 (6th Cir. 2004)(Imperfect enforcement of the Michigan Department of Corrections Policy Directive 01.03.140 prohibiting smoking in all occupied buildings, including housing units, "show[ed], at most, negligence by the defendants rather than deliberate indifference."); *Morrer v. Price*, 83 F. App'x 770, 773 (6th Cir. 2003); *see also Brown v. Head*, 190 F. App'x 808, 810 (11th Cir. 2006); *Rivera v. Marcoantonio*, 153 F. App'x 857, 859 (3d Cir. 2005); *Ciempa v. Ward*, 150 F. App'x 905, 908 (10th Cir. 2005); *Kelly v. Hicks*, 400 F.3d 1282 (11th Cir. 2005); *accord Johnson v. Goord*, No. 01 Civ. 9587(PKC), 2004 WL 2199500, at *17 (S.D.N.Y. Sept. 29, 2004)("No system of enforcement, however, will be perfect, and prison officials cannot be held accountable under the Constitution for failing to extinguish every attempt to flout the [prison's] rules [regarding smoking]."). Gradual implementation of non-smoking policies does not constitute deliberate indifference. *See Johnson v. Goord*, No. 01 Civ. 9587(PKC), 2005 WL 2811776, at * 7 (S.D.N.Y. Oct. 27, 2005)("The adoption of a policy designed to eliminate indoor smoking completely, though not in one fell swoop, cannot be said to demonstrate deliberate indifference to an inmate's health, especially in light of the unique issues faced in administering a correctional facility."). Plaintiff's decision to withhold information necessary for prison officials to identify and punish violators severely undercuts any Eighth Amendment claim. *See Wester v.*

*Raines,* No. 5:05-cv-160-SPM, 2007 WL 171898, at * 1, 5 (N.D. Fla. Jan. 17, 2007); *Ciempa*, 150

F. App's at 908; *Omar v. Brooks*, 2004 WL 3258917, at * 4 (E.D. Va. Aug. 30, 2004)(Defendants

were not deliberately indifferent to asthmatic prisoner's exposure to ETS where prisoner's "steadfast

refusal to identify offenders obstructed remedial action within his unit" and his complaints were "at

least partially motivated by his desire to transfer" to a different prison facility.).  On the this record,

no reasonable trier of fact could find in plaintiff's favor on the subjective component of "future

injury" Eighth Amendment claims against defendants.

        The evidence plaintiff presented on the objective component is likewise deficient.

It was plaintiff's burden to present evidence that he had been exposed to unreasonably high levels

of ETS and the exposure's significant adverse impact on plaintiff's future health.  Plaintiff presented

evidence that he experienced some ETS exposure during the months he was an inmate at LCF.

Plaintiff's proofs are devoid of specifics as to which prisoners were smoking on which dates, how

close such prisoners were in proximity to plaintiff and for how long, and what steps, if any plaintiff

took to minimize his exposure either through movement or reporting the offending prisoner or

prisoners.  Plaintiff did not submit any scientific evidence measuring or quantifying his level of

exposure.  Affidavits to the effect that "some exposure" occurred are insufficient to support this type

of Eighth Amendment claim.  *See Lewis v. Jarriel*, No. CV-304-96, 2006 WL 839390, at * 4 (S.D.

Ga. Mar. 24, 2006); *see also Mansoori*, 2007 WL 401290, at * 10.  Furthermore, a prisoner's

"exposure to smoke must cause more than mere discomfort or inconvenience." *Talal v. White*, 403

F.3d at 426.  Plaintiff did not present  medical evidence that his exposure to ETS at LCF caused him

anything beyond discomfort.  *See Oliver v. Deen*, 77 F.3d 156, 159-61 (7th Cir. 1996)(An asthmatic inmate's assignment to cells with smoking inmates for 133 days resulting in ETS exposure which aggravated the plaintiff's asthma and necessitated his increased use of an inhaler failed to satisfy the objective component.); *see also Kelley v. Hicks*, 400 F.3d 1282, 1285 (11th Cir. 2005).  Plaintiff did not present any scientific or statistical evidence regarding the seriousness of potential harm and the likelihood that such injury to health would actually be caused by exposure to ETS.  509 U.S. at 36; *see Larson v. Kempker*, 414 F.3d 936, 940 (8th Cir. 2005); *Morris v. Lorillard*, No. 1:04-cv-2617, 2006 WL 2796029, at * 4-5 (M.D. Pa. Sept. 25, 2006); *Phillips v. Plunkett*, No. 1:03-cv-109LMB, 2006 WL 839185, at * 9 (E. D. Mo. Mar. 27, 2006).   Moreover, it was plaintiff's burden to show that the risk he complains of is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk" -- that "the risk of which he complains is not one that today's society chooses to tolerate." 509 U.S. at 36.  It is obvious from the wealth of case law in this area that the risk of which plaintiff complains of *is* one that today's society chooses to tolerate.  *See Oliver v. Deen*, 77 F.3d at 158; *see also Griffin v. DeRosa*, 153 F. App'x 851, 853 (3d Cir. 2005)(A prisoner's allegations that he had been exposed to ETS in inadequately ventilated restrooms because each time he entered the restroom he found eight-to-ten inmates smoking failed to allege unreasonably high levels of ETS contrary to contemporary standards of decency.); *Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001)("While [the prisoner's] sporadic and fleeting exposure to second-hand smoke might have been unwelcome and unpleasant, it did not constitute 'unreasonably high levels of ETS.'"); *Hankins v. Bethea*, No. CIV. A 0:05-3334 DCNBM, 2007 WL

172509, at * 6 (D. S.C. Jan. 18, 2007)("Exposure to moderate levels is a common fact of contemporary life, and Plaintiff has failed to present evidence to show that the amount of ETS he was exposed to during the relatively short [5-month] period of time set forth in his complaint was at such an unreasonably high level that it violated contemporary standards of decency.");  *Despart v. Kearney*, No. 2:02-cv-4-FTM-29DNF, 2006 WL 2789007, at * 12 (M.D. Fla. Sept. 26, 2006); *Wester v. Raines*, No. 5:05 cv 160/SPM/EMT, 2006 WL 2644931, at * 5 (N.D. Fla. Sept. 14, 2006)("[E]xposure to second-hand smoke is an ordinary consequence of everyday life for *non-prisoners* as office buildings, restaurants and other public facilities often have designated smoking areas at or near their entrance."); *Colon v. Sawyer*, No. 9:03-CV-1018 LEK/DEP, 2006 WL 721763, at * 9 (N.D.N.Y. Mar. 20, 2006)(Asthmatic plaintiff's claim that "he [was] housed in a dormitory unit where smoking [was] permitted, and that he [was] subjected to ETS near the dining hall entrance and exit, as well as his speculation that such circumstances 'may result in catastrophic harm to him' simply [does] not describe conditions which rise to a level which today's society chooses not to tolerate."); *Bloch v. Garrison*, No. Civ. A. 1:05 CV 318, 2006 WL 623587, at * 2 (E.D. Tex. Mar. 10, 2006)(Intermittent exposure to ETS when inmates occasionally smoked in the housing unit's bathrooms and sleeping areas in violation of prison policy constituted limited exposure that "did not rise to the level of environmental tobacco smoke necessary to state an Eighth Amendment claim."); *see also Conyers v. Michigan Dep't of Corrections*, No. 5:06-cv-100, 2006 WL 2644990, at * 6 (W.D. Mich. Sept. 14, 2006); *Roberts v. Ozmint*, No. 05-2324-MBS-WMC, 2006 WL 2303183, at

-29-

* 10 (D. S.C. Aug. 8, 2006).  In summary, I find that defendants are entitled to judgment in their

favor as a matter of law on all plaintiff's Eighth Amendment claims.

## III.    Qualified Immunity

Alternatively, I find that defendants are entitled to qualified immunity.  The Supreme

Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), emphasized that the defense of

qualified immunity must be addressed in proper sequence.  The initial inquiry must be whether the

plaintiff has alleged and supported with evidence[8] facts showing that the defendants' conduct

violated a constitutional right.  *Saucier*, 533 U.S. at 201; *see Silberstein v. City of Dayton*, 440 F.3d

306, 311 (6th Cir. 2006); *see also Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir.

2006)("Whether a constitutional violation occurred is a threshold issue: if the officers' conduct

violated no constitutionally protected right, there is no need for further analysis."); *accord Caudill*

*v. Hollan*, 431 F.3d 900, 908 n.5 (6th Cir. 2005)("[D]istrict courts . . . may not assume a

constitutional violation or skip to qualified immunity, even when qualified immunity analysis seems

---

[8]A qualified immunity defense can be asserted at various stages of the litigation, including
the summary judgment stage.  *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994).  The qualified
immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in
that generalized notice pleading no longer suffices, and the broader summary judgment record
provides the framework within which the actions of each individual defendant must be evaluated.
*See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004).  At the summary judgment
stage, a plaintiff may not rely on his pleadings.  Rather, the issue is whether "the plaintiff has offered
sufficient evidence to indicate that what the official did was objectively unreasonable in light of the
clearly established constitutional rights."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905
(6th Cir. 2004).

-30-

conclusive.").  Plaintiff did not satisfy the threshold constitutional violation  requirement for the reasons previously stated.

Assuming *arguendo* that plaintiff had been able to satisfy the initial requirement, plaintiff would nonetheless fall short of showing that the right plaintiff claims each defendant violated was "clearly established" such that a reasonable official in the defendant's position, at the time the act was committed, would have understood that his or her behavior violated that right.  533 U.S. at 201.  The Supreme Court's recent decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004), examined the underlying purpose of the requiring that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted.  . . .  Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198.  The Supreme Court and the Sixth Circuit have emphasized that the second inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein*, 440 F.3d at 316.  "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense.'"  *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005)(quoting *Brosseau*, 543 U.S. at 199).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Rippy v. Hattaway*, 270 F.3d 416, 424 (6th Cir. 2001).

-31-

"Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201); *see Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003); *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002).  Although it is not always necessary to find a case where identical conduct had previously been determined to be unconstitutional,[9] in light of pre-existing law, the unlawfulness must be apparent.  *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Risbridger*, 273 F.3d at 569.  "'[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Armstrong*, 432 F.3d at 699 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).  The court must focus on whether, at the time the defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit.  *See Reynolds v. City of Anchorage*, 379 F.3d 358, 366 (6th Cir. 2004); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002).  "If reasonable officials could disagree on the issue, immunity should be recognized." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042.  "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion

---

[9]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199; *Lyons*, 417 F.3d at 572.

-32-

for every-like situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997); *see Gragg*, 289 F.3d at 964. "The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key* 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)).

Plaintiff was transferred into LCF on March 30, 2005. On May 12, 2005, plaintiff obtained a special accommodation notice, and through correspondence from plaintiff the defendants learned that plaintiff had asthma. Plaintiff's asthma never required emergency medical treatment. Smoking was prohibited in all prison housing units during plaintiff's entire incarceration at LCF, and prisoners received punishment for violating the rules against smoking. Defendants provided plaintiff with 4 housing assignments during his 7 months of confinement at LCF, designated Unit E-2 as a tobacco-free unit and assigned plaintiff to that unit. There was and is no Supreme Court or Sixth Circuit authority finding a violation of the Eighth Amendment's Cruel and Unusual Punishments Clause under remotely similar circumstances. I find that defendants are entitled to judgment in their favor as a matter of law on the alternative basis of qualified immunity.

-33-

**Recommended Disposition**

For the reasons set forth herein, I recommend that defendants' motion for summary judgment (docket # 21) be granted, and that judgment be entered in favor of defendants Howes and Welke on all plaintiff's claims.

Dated:  March 5, 2007             /s/  Joseph G. Scoville
                                  United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).